IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

**NICK LEPETSOS**,

    Plaintiff,

v.

**FIRST AMERICAN BANCORP, a Colorado Corporation, and
FIRST AMERICAN STATE BANK, a Colorado State Chartered Bank**,

    Defendants.

## COMPLAINT

Plaintiff, Nick Lepetsos, ("Mr. Lepetsos or "Plaintiff") by and through his attorneys, Arckey & Associates, LLC, states the following complaint against First American Bancorp, a Colorado Corporation and First American State Bank, a Colorado State Chartered Bank.

### I.  PARTIES

1. Plaintiff, Nick Lepetsos is a resident and citizen of the United States of America and the state of Colorado.

2. First American State Bank ("FASB") is a Colorado corporation formed on March 28, 1995 headquartered at 8390 E. Crescent Parkway, Suite 100 Greenwood Village, Colorado 80111.

3. First American Bancorp ("FAB") is a Colorado corporation formed on November 19, 1998 and does business at 8390 E. Crescent Parkway, Suite 100 Greenwood Village, Colorado 80111.

4. FAB is the holding company for FASB.

5. Mr. Lepetsos was an employee of FASB from May 2002 until November 15, 2017.

6. During this time, Mr. Lepetsos served as the President of and a Director on the Board of Directors of both FASB and FAB.

7. From May 2, 2002 until November 15, 2017 Mr. Lepetsos was an employee of FASB as defined and interpreted under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1002(6) and Colorado Wage Claim Act ("CWCA") C.R.S. § 8-4-101(6).

8. At all times material hereto, FASB and FAB were an employer within the meaning of the definitions set forth in the ERISA, 29 U.S.C. §1002(5) and the CWCA, C.R.S. § 8-4-101(6).

9. At all times material hereto, FAB was an Administrator and/or Plan Sponsor within the meaning of the definitions set forth in the ERISA, 29 U.S.C. §100(16)(A),(B).

10. During Mr. Lepetsos' employment at FASB, the members of the Board of Directors of FAB and FASB were identical.

11. As of August 2017, the Board of Directors of FASB and FAB consisted of John ("Jay") R. Davidson, Jr., John Hachmeister, Kevin Prelud, Larry Spivack and Nick Lepetsos. Mr. Davidson is the largest and controlling shareholder of FAB.

## II.  JURISDICTION AND VENUE

12. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 29 U.S.C. §1132(e)(1) and 28 U.S.C. § 1367, asserting supplemental jurisdiction on Plaintiff's state law claims.  Plaintiff's state law claims are asserted in the alternative to the extent the Executive Management Bonus Program is not a plan governed by ERISA, which Plaintiff asserts it is not so governed.

13. The acts complained of herein were committed, or had their principal effect within the District of Colorado, and therefore venue for this civil action is proper pursuant to 28 U.S.C. §§ 1391(b),(c) and 29 U.S.C. § 1132(e)(2).

14. Plaintiff has complied with all administrative prerequisites and exhausted administrative remedies as required by law. The Plan at issue as described below does not contain any administrative process or appeal process. Plaintiff has made demands upon Defendants for payment of the benefits under the Plan and for his bonus. Defendant has denied all Plaintiff's demands, including threatening Plaintiff with legal action if he fails to discontinue his demands for payment.

## III. GENERAL ALLEGATIONS

15. Plaintiff incorporates by reference and realleges each and every allegation contained in this complaint with the same force and effect as if fully set forth herein.

16. Mr. Lepetsos was hired by First American Bank on May 2, 2002 and promoted to President in November 2004.

17. During his employment Mr. Lepetsos was not subjected to any disciplinary actions and was never placed on a Performance Improvement Plan, or otherwise disciplined for any performance issues.

18. Mr. Lepetsos received regular salary increases, received yearly bonuses under the Executive Officer Bonus Program and was afforded key person employee benefits.

**Stock Appreciation Rights Plan**

19. One key person benefit was the First American Bancorp 2008 Stock Appreciation Rights Plans.

20. In 2008 FAB adopted the First American Bancorp 2008 Stock Appreciation Rights Plan (the "Plan"). The Plan was amended in 2011.

21. The stated objectives of the Plan are (1) to recognize and reward significant contributions which key personnel and directors of the company and its subsidiaries have made in increasing the value of the Company's stock; (2) provide incentives to participants in the Plan to continue to make significant contributions to ensure a successful future for the Company, and (3) attract and retain employees and directors who will make such contributions.

22. The First American Bancorp 2008 Stock Appreciation Rights Plan and the 2011 First Amendment thereof is a plan, fund or program that is established for the purposes of providing ERISA employee benefits that requires ongoing administrative program to meet the employer's obligation and thus is a covered employee welfare benefit plans or retirement plans within the meaning of 29 U.S.C. § 1002(1) and (2)(A) and are subject to the provisions of the ERISA.

23. At all times material hereto, Mr. Lepetsos was and is Participant as defined and interpreted under ERISA, 29 U.S.C. §1002(7).

24. On July 22, 2008 FAB awarded to Mr. Lepetsos Stock Appreciation Rights ("SARs") because according to the Plan he "made significant contributions to the Company's success in the past." (emphasis added).

25. In accordance with the Plan's terms, the SARs were awarded in increments of twenty percent (20%) per year over a four (4) year period.

26. On December 13, 2010 at a regular meeting of the FASB Board of Directors meeting, the Board amended the 2008 Plan. The Board cancelled the 2008 SARs awarded and

replaced the 2008 SARs with 2011 SARs in an equal number to those awarded under the 2008 Plan to Participants.  The Board determined that the exercise price for all SARs would be $58.50, which equaled the fully diluted book per value share of common stock.

27. On January 1, 2011, the Board of FAB issues a resolution adopting the changes to the Plan, stating that the "Company still desires to recognize and reward the significant contributions of key personnel and directors for helping the Company through the difficult economy and again increasing the Company stock."

28. The Board ratified all other terms of the SAR program and adopted the First Amendment to the Plan, specifically replacing paragraph 13 of the Plan, adopting the following language, "the Board may not take any action that shall materially and adversely affect any outstanding SARs without the consent of the SAR holders holding such outstanding SARs."

29. On January 1, 2011, FAB awarded the SARs to Mr. Lepetsos as an eligible Participant in the Plan "and who has made significant contributions to the Company's success <u>in the past</u>." (emphasis added).

30. Mr. Lepetsos was awarded 5,040 SARs.  In accordance with the Plan's terms and the January 1, 2011 Stock Appreciation Rights Agreement executed between FAB and Mr. Lepetsos, twenty percent (20%) of the SARs were awarded to Mr. Lepetsos were granted immediately, with an additional twenty percent (20%) granted on each anniversary date of the initial grant over a four (4) year period.

31. Under the Plan, a SAR shall become fully vested on the date three (3) years following the date on which the SAR is granted.

32. Thus, Mr. Lepetsos was vested in SARs as follows: (1) vested in the January 1, 2011 SARs grant of 1,008 on January 1, 2014; (2) vested in January 1, 2012 SARs grant of 1,008 SARs on January 1, 2015; (3) vested in January 1, 2013 SARs grant of 1,008 SARs on January 1, 2016; and (4) vested in January 1, 2014 SARs grant of 1,008 SARs on January 1, 2017.  Mr. Lepetsos was to vest in his 1,008 SARs grant of January 1, 2015 on January 1, 2018, six weeks after his termination of employment.

**Federal Reserve Bank Oversight and Restrictions**

33.  Since the financial crisis of 2007-2008, FASB and FAB have been under increased oversight of the Federal Reserve Bank of Kansas City which in August 2010 issued a public enforcement action against both FASB and FAB, which prohibited the issuance of dividends by both entities FAB and FASB.  That prohibition resulted in the inability of the FAB to use dividend earnings of the subsidiary bank to make payments on its senior debt obligation.  The public enforcement action also prohibited FASB and FAB from refinancing the senior debt obligation, repurchasing outstanding common stock, and making payments on FAB's Trust Preferred Securities without prior regulatory approval.

34. FAB's controlling shareholder, Chief Executive Officer and Chairman of the Board of Directors of both FAB and FASB Mr. Davidson, Jr., announced to the Board the Federal Reserves' assertion and asked that directors give some additional thought to how to solve the Federal Reserve Bank's decision to remove the dividend restrictions.

35. As a director of FAB and FASB, Mr. Lepetsos, and all directors owed fiduciary duties to the shareholders, the primary responsibility of a corporate board of directors is to protect the shareholders' assets and ensure they receive a favorable return on their investment.

36. On July 31, 2017, Mr. Lepetsos presented an opportunity to Mr. Davidson that as proposed, would consist of new yet to be identified investors providing a meaningful amount of new capital to the institution in exchange for an ownership interest commensurate with their investment.  The proposal consisted of a structure that included additional capital sufficient to pay off the defaulted debt and recapitalize the bank to a level that would be likely to remove the bank from any regulatory restrictions.  The proposal was constructed in a manner that provided existing shareholders with the opportunity to either tender their shares for sale at a value equal to 1.5 times the current book value per share, or retain their investment in the restructured and recapitalized bank.  The structure of the offer also proposed that the book value per share attributable to shareholders who chose to remain would not be reduced at all by the transaction.  The proposal would require Mr. Davidson to relinquish his controlling shareholder interest.

37. Mr. Davidson was visibly angry at Mr. Lepetsos.  From that meeting on July 31, 2017 until his termination of employment, Mr. Davidson did not speak to Mr. Lepetsos or address him personally, with the exception of times when they were both in the audience of regulators, elected officials, or board members.  Mr. Davidson excluded Mr. Lepetsos from the Board of Directors meeting at which the proposal was discussed and refused Mr. Lepetsos the opportunity to present the offer directly to the Board of Directors or be present at the board meeting to offer details and clarifications of its terms, but instead presented the details of the offer himself.  Mr. Davidson also excluded Mr. Lepetsos from executive management meetings, which made it impossible for him to contribute anything meaningful at the board and executive meetings.

38. Mr. Davidson's treatment of him was solely in response to the disagreement regarding the proposed strategy to raise new capital sufficient to retire the senior debt, rectify the regulatory enforcement action prohibiting dividends to shareholders and providing new capital to support the future growth of the institution in order to pave the way for shareholders receive a return on their investment as submitted in the July 31, 2017 proposal.

39. Between July 31, 2017 and November 15, 2017 the bank was due for a full-scope bank regulatory exam in August 2017. Mr. Lepetsos was a key and necessary employee involved in that examination. Soon after FAB and FASB received the written Report of Examination, Mr. Lepetsos' employment was terminated.

40. On November 15, 2017 in his termination meeting, attended by the Bank's attorney and Mr. Davidson, Mr. Lepetsos was told that "it was time for us to part ways." There was no stated reason for the termination and especially no mention of any cause termination.

41. At the November 15, 2017 termination meeting, Mr. Lepetsos was provided a proposed Separation Agreement that made no mention of a "for cause" termination, but instead stated his resignation is effective November 15, 2017. At no time was Mr. Lepetsos told or informed that if he did not accept the terms of the proposed Separation Agreement his employment would be terminated for cause. The proposed agreement also confirmed Mr. Lepetsos' participation and rights to his vested shares of the 2008 Stock Appreciation Rights Program, as amended 2011, the Deferred Bonus Compensation Plan and a six (6) week severance benefit. The agreement also contained a noncompetition agreement for 24 months. During his employment, FASB nor FAB ever required Mr. Lepetsos to execute a noncompetition agreement.

42. On November 28, 2017, Mr. Lepetsos proposed modifications to the proposed Separation Agreement. One modification requested to the Separation Agreement was the requirement that the noncompetition agreement be reduced from 24 to 12 months, otherwise accepting the terms of the proposed language to the paragraph containing the noncompetition agreement in its entirety.

43. The next communication from Defendants was on December 11, 2017, through its counsel. Defendant stated inaccurately that Plaintiff had rejected the noncompetition agreement, then as a result stated Mr. Lepetsos' termination was "for cause" alleging breach of fiduciary duties. The alleged cause basis, raised for the first time, was an issue about a credit card portfolio debt issue that had been an ongoing issue for the Bank for at least four years prior to November 2017. During those four years, Defendants never disciplined Mr. Lepetsos, never accused him of wrongdoing or a breach of fiduciary duties, but in fact paid him several yearly bonuses and increases in compensation.

**FASB Deferred Bonus Compensation Plan**

44. Plaintiff also participated in the FASB Deferred Bonus Compensation Plan. This plan was governed by ERISA pursuant to the express terms of the Plan.

45. Defendants paid Plaintiff $108,933 under the FASB Deferred Bonus Compensation Plan, notwithstanding Defendants alleged "for cause" termination of Mr. Lepetsos' termination of employment announced on December 11, 2017, some twenty-seven (27) days after he was told his employment was not a for cause termination.

**Executive Management Bonus Program**

46. FASB has provided a bonus program to its employees. FASB does not have any written plan implementing the bonus program.

47. In response to demands for payment of his bonus, FASB has not asserted the bonus program is governed by ERISA.

## IV. FIRST CLAIM FOR RELIEF
### (Interference, Retaliation and Adverse Action under ERISA 29 U.S.C. § 1140 and 29 U.S.C. § 1132(a)(1)(B)

48. Mr. Lepetsos incorporates by reference and re-alleges each and every allegation contained in all of this complaint, with the same force and effect as if fully set forth herein.

49. Defendants interfered with and retaliated against the legally protected rights of Plaintiff to attain benefits under the Plan governed by ERISA, as defined by 29 U.S.C. § 1002(1), in violation of 29 U.S.C. § 1140.

50. Section 7.5 of the Plan is unlawful as it is a forfeiture of rights prohibited by ERISA.

51. First American State Bank unlawfully interfered with and retaliated against Mr. Lepetsos by terminating his employment in violation of 29 U.S.C. § 1140 and denying him his vested rights under the Plan.

52. Plaintiff was vested in 4,032 SARs and entitled to receive another 1,008 SARs on January 1, 2018.

53. Notwithstanding a stellar employment record of over 15 years with Defendants and the purpose of the Plan to reward Plaintiff for past services rendered between 2002 and 2008, Defendants unlawfully denied Plaintiff's vested benefits and soon to be attained benefits, terminating Plaintiff under the guise of poor work performance and false allegations of breach of fiduciary duties.

54. Mr. Lepetsos' termination of employment was pretextual and unlawful retaliation and a motivating factor by Defendant in violation of 29 U.S.C. § 1140.

55. Defendants' termination of Mr. Lepetsos also illegally interfered with prospective benefits to which Mr. Lepetsos would have been entitled under the Plan in violation of 29 U.S.C. § 1140.

56. As a result of Defendants' conduct in violation of 29 U.S.C. § 1140, Mr. Lepetsos has suffered a loss of employment and all wages and benefits associated with his employment in the amount of at least $75,250, including those to which he is entitled to enforce those rights under covered ERISA plans in excess of $325,000 and to clarify his rights to future benefits pursuant to 29 U.S.C. § 1132(a)(1)(B), and he is entitled to recovery of those wages and benefits.

## V.  SECOND CLAIM FOR RELIEF
### (Right to Recovery of Benefits 29 U.S.C. § 1132(a)(1)(B))

57. Mr. Lepetsos incorporates by reference and re-alleges each and every allegation contained in all of this complaint, with the same force and effect as if fully set forth herein.

58. Defendants unlawfully denied Mr. Lepetsos benefits to which he was entitled under ERISA.

59. The denial of benefits was made in bad faith, motivated by personal animus of Defendants' CEO and Chairman towards Plaintiff as a result of Plaintiff's proposal to recapitalize FASB and FAB, was arbitrary, capricious and not a reasonable interpretation of the plan's terms.

60. Defendants and its CEO and Chairman had a conflict of interest in determining Mr. Lepetsos' eligibility for benefits in that they were responsible for determining eligibility for benefits and for paying benefits.

61. The law requires a reduction in deference to Defendants' decisions, because it acted as the plan administrator and decision maker in Plaintiff's employment termination.

62. Therefore, Defendants bear the burden of proving the reasonableness of its decision by substantial evidence.

63. As a result of Defendants' conduct in violation of 29 U.S.C. § 1140, Mr. Lepetsos has suffered a loss of employment and all wages and benefits associated with his employment in the amount of at least $75,250, including those to which he is entitled to enforce those rights under covered ERISA plans in excess of $325,000 and to clarify his rights to future benefits pursuant to 29 U.S.C. § 1132(a)(1)(B), and he is entitled to recovery of those wages and benefits.

## VI. THIRD CLAIM FOR RELIEF
### Breach of Contract Colorado Wage Claim Act, C.R.S. §8-4-101 *et seq*.

64. Mr. Lepetsos incorporates by reference and re-alleges each and every allegation contained in all of this complaint, with the same force and effect as if fully set forth herein, but in alternative to any claim not governed by ERISA.

65. Defendants owes Plaintiff wages, specifically a bonus of $75,250, under the 2017 Executive Officer Bonus Program. Those wages are earned, vested, and determinable pursuant to the terms of his employment.

66. Defendant First American State Bank has failed to pay Plaintiff the wages owed.

67. Plaintiff made a written demand for the payment of wages.

68. Defendant First American State Bank failed to pay any wages in response to Plaintiff's demand within fourteen (14) days of the date of such demand.

69. First American State Bank's failure to pay earned, vested, and determinable wages to Plaintiff caused Plaintiff to suffer economic injuries.

70. Defendant First American State Bank's failure to pay Plaintiff wages within fourteen (14) days of the demand for payment entitles Plaintiff to penalties as set forth in C.R.S. §8-4-109, including, but not limited to, costs of litigation, and reasonable and necessary attorneys' fees under C.R.S. § 8-4-110(1).

## VI. FOURTH CLAIM FOR RELIEF
### Unjust Enrichment

71. Mr. Lepetsos incorporates by reference and re-alleges each and every allegation contained in all of this complaint, with the same force and effect as if fully set forth herein, but in alternative to any claim not governed by ERISA.

72. Mr. Lepetsos was entitled to a bonus under the 2017 Executive Officer Bonus Program.

73. Defendants have derived substantial benefits and enrichments as a result of the work conducted by Mr. Lepetsos.

74. Mr. Lepetsos fully performed any obligations he had under any agreements, and did so with the expectation that he would be paid a reasonable value for his work conducted.

75. Defendants knowingly accepted the benefits of Mr. Lepetsos' services without giving reasonable compensation, and knowing that Mr. Lepetsos expected to be paid.

76. Defendants have retained those benefits such that it would be inequitable for them to retain them.  Mr. Lepetsos cannot recover the benefits conferred because he offered services of which Mr. Lepetsos benefitted and continue to benefit.

77. Mr. Lepetsos acted in reliance on Defendants' statements and continued to work for Defendants.

78. As a result, Mr. Lepetsos has suffered damages, and Defendants have been unjustly enriched, in an amount to be determined at trial.

Wherefore, Plaintiff respectfully requests the Court to find in his favor and against Defendant and grant the following relief:

1. Declare that Defendant's acts and practices complained of herein are in violation of ERISA and constituted intentional and/or willful conduct by Defendant;

2. Enjoin and permanently restrain these violations;

3. Direct Defendant to take affirmative steps as are necessary to ensure that the effects of these unlawful employment practices conduct are eliminated from its workplace and do not continue to affect Plaintiff's employment opportunities;

4. Direct that Plaintiff be reinstated and/or award Plaintiff back pay and actual damages in an amount to be determined at trial to compensate his for lost wages, benefits and employment opportunities;

5. Award Plaintiff front pay in an amount to be determined at trial;

6. Award Plaintiff a sum of monies to offset the taxable effect of his damage award;

7. Retain jurisdiction of this matter to ensure full compliance with the Orders of this Court;

8. Award Plaintiff reasonable attorneys' fees and costs of this litigation;

9. Award Plaintiff pre-judgment and post judgment interest and the costs of this action together with reasonable expert witness fees as provided by law; and

10. Grant such other and further relief as this Court deems necessary and proper.

## **Demand for Jury Trial**

Plaintiff, hereby demands a trial by jury on all issues so triable.

*s/ Thomas J. Arckey*
Thomas J. Arckey
ARCKEY & ASSOCIATES, LLC
6465 Greenwood Plaza Blvd., Suite 250
Centennial, CO  80111
(303) 798-8546
(303) 798-4637 fax
Email:  tja@arlaw.us
Attorneys for Plaintiff